| |
|---|
| **Walker v Quinn** |
| 2024 NY Slip Op 33670(U) |
| October 16, 2024 |
| Supreme Court, Kings County |
| Docket Number: Index No. 512794/2019 |
| Judge: Consuelo Mallafre Melendez |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

**At an IAS Term, Part 15 of the Supreme Court of the State of NY, held in and for the County of Kings, at the Courthouse, at 360 Adams Street, Brooklyn, New York, on the 16th day of October 2024.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-------------------------------------------------------------------------X

RIA WALKER,

      Plaintiff,

  -against-

ANTONIA QUINN, M.D., MOHAMED R. ELFATIHI, M.D., CONEY ISLAND HOSPITAL and NEW YORK CITY HEALTH & HOSPITALS CORPORATION,

      Defendants.

-------------------------------------------------------------------------X

**DECISION & ORDER**

Index No. 512794/2019
Mo. Seq. 2

**HON. CONSUELO MALLAFRE MELENDEZ, J.S.C**.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:

NYSCEF #s: 67 – 69, 70 – 87, 89, 90 – 94, 95

Defendants Antonia Quinn, M.D. ("Dr. Quinn"), Mohamed R. Elfatihi, M.D. ("Dr. Elfatihi"), and New York City Health and Hospitals Corporation ("NYCHHC") move (Seq. No. 2) for an Order, pursuant to CPLR § 3212, awarding summary judgment and dismissing all claims and causes of action against the defendants. Plaintiff opposes this motion.

Plaintiff Ria Walker (hereinafter "Plaintiff") commenced this action on May 31, 2019, alleging claims of medical malpractice and negligence against Defendants in connection to the care rendered to Walker during her visit to Kings County Hospital ("KCH") Emergency Department, on July 5, 2018, which allegedly resulted in the failure to diagnose and/or treat Plaintiff's myocardial infarction and improper discharge.

Plaintiff's first episode of chest pain occurred on June 30, 2018, while she was climbing stairs. On July 4, 2018, she had another episode of chest pain while running to catch a train. Later that evening she felt chest tightness while lying in bed. Each episode resolved in five minutes or less (*see* KCH records, at 5).

1

[* 1]

On July 5, 2018, at approximately 1:30 p.m., Plaintiff presented to KCH's Emergency Department ("ED"), complaining of intermittent chest pain beginning five days earlier (*id.* at 4). Plaintiff was seen by a triage nurse and an EKG was performed. Plaintiff reported she had been experiencing chest pain—both when walking and at rest—that was tight in character, but without pressure or burning sensations and it was non-radiating. Plaintiff denied experiencing any shortness of breath, nausea, vomiting, dizziness, leg swelling, cough, or palpitations, and stated that the chest pain did not feel like her usual asthma (*id.*, at 5).

Plaintiff was examined by Dr. Elfatihi, a resident who was under the supervision of the ED attending physician, Dr. Quinn. Dr. Elfatihi asked the Plaintiff about her medical history, which he noted down in her chart as three recent episodes of chest tightness and a history of hypertension, diabetes, and asthma.

Following the examination, Drs. Quinn and Elfatihi formulated a differential diagnosis. Dr. Quinn reviewed her EKG, which showed "borderline T abnormalities" (*id.*, at 21). Drs. Quinn and Elfatihi also ordered a chest x-ray, blood work, and a troponin test.[1] The results of the chest x-ray showed "no acute findings" and the troponin test was negative, indicating Plaintiff's troponin levels were within normal limits (*id.* at 18). Drs. Quinn and Elfatihi calculated Plaintiff's risk for Major Adverse Cardiac Events ("MACE") using the HEART Score[2]. Plaintiff's score on the assessment indicated that she was at low risk for MACE in the next thirty days.

After reviewing the Plaintiff's medical history, ED tests, and completed examination, Drs. Quinn and Elfatihi discharged Plaintiff with instructions to present for an outpatient workup. At the time of her discharge, the record notes Plaintiff was instructed to follow-up with a primary care provider in 3-14 days[3] and return to the ED if she felt "worsening pain, chest pain, shortness of breath, or other concerning symptoms" (*id.*, at 9). Plaintiff was provided with a written copy of these instructions when she was discharged, and she testified that

---

[1] Troponins are an enzyme that is released into the blood when the heart muscle is experiencing cardiac damage.

[2] The HEART Score is a diagnostic tool, also known as a cardiac CT calcium score or coronary calcium scan. It is calculated by assessing five aspects of the patient's presentation: History, EKG, Age, Risk Factors, and Troponin. A score of 0-3 indicates a low risk for MACE, 4-6 points is a moderate risk, and 7 or above indicates high risk.

[3] The instructions also stated that Plaintiff could go to the KCH walk-in clinic any weekday for follow-up, if a visiting her primary care provider was unavailable.

2

[* 2]

she received written and verbal instructions. She testified that she felt chest tightness on the way home from the hospital, but it was "not as intense" as the previous episodes.

After her discharge, Plaintiff testified that she experienced intermittent chest pains from July 6, 2018, to July 19, 2018. During this period, Plaintiff did not return to the ED or follow-up with the KCH walk-in clinic, nor did she seek treatment from another doctor. She testified that she believed these episodes were not worse than her earlier symptoms and therefore not serious.

On the evening of July 19, 2018, Plaintiff's chest pain worsened, radiating to her armpits, and caused her to wake up with cold sweats. She experienced persistent chest pain the following morning. At around 2:00 p.m. on July 20, 2018, Plaintiff went to Bayonne Medical Center where she was diagnosed with a heart attack. See was admitted for cardiac catheterization, balloon angioplasty, and placement of a stent.

Plaintiff alleges that Defendants Dr. Quinn and Dr. Elfatihi deviated from good and accepted medical practice in failing to diagnose or treat acute coronary syndrome, improperly discharging Plaintiff, and failing to provide Plaintiff with adequate post-discharge instructions. Further, Plaintiff alleges that these departures "proximately caused the severe injuries, conditions, associated direct complications and pain and suffering sustained and suffered by the Plaintiff." Plaintiff alleges that Defendants' acts and omissions denied Plaintiff the opportunity to avoid a future infarct.

Generally, "[i]n determining a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party" (*Stukas v Streiter,* 83 AD3d 18, 22 [2d Dept 2011]). In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department:

"The elements of a medical malpractice cause of action are a deviation or departure from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries. When moving for summary judgment, a defendant provider has the burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby. In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars. In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial

3

burden. General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat a defendant's summary judgment motion. Although summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (*Barnaman v Bishop Hucles Episcopal Nursing Home,* 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotation marks and citations omitted]).

In support of this motion, movants submit an expert affirmation from Andrew Sama, M.D. ("Dr. Sama"), a practicing physician board certified in emergency medicine and internal medicine, as well as medical records and deposition transcripts. The court accepts Dr. Sama's qualification as an expert in the stated fields.

Based on his review of the record, Dr. Sama opines that the Defendants properly evaluated Plaintiff when she came into the ED on July 5, 2018, in accordance with the standard of care. Dr. Sama states that Dr. Elfatihi properly documented Plaintiff's medical history, obtaining a detailed and complete history. Dr. Sama opines that Defendants' examination of the Plaintiff—which was negative for any symptoms and showed a regular heart rate and rhythm—was also in accordance with accepted medical practice. Dr. Sama further opines that the EKG ruled out an acute cardiac event and that Dr. Quinn's interpretation was correct.

As to Plaintiff's claims regarding Dr. Quinn's failure to examine the Plaintiff herself, Dr. Sama opines that Dr. Quinn's overall involvement with Plaintiff's care was appropriate and comported with generally accepted standards of ED care. He opines that it is "generally accepted that an ED attending's approval is required in connection with the establishment of patient plans of care and all discharge determinations." Dr. Sama opines that Dr. Quinn's involvement was in accordance with the standard of care, as Dr. Elfatihi was acting under her supervision throughout the entire admission, and no planning or discharge decisions were made without her approval or prior consult.

4

Dr. Sama opines that the differential formulated by the Defendants was appropriate[4] and met the standard of care for a patient with intermittent chest pain, a benign examination, an EKG with nonspecific findings, and the absence of present symptoms. Dr. Sama also opines that Defendants' workup plan to rule out acute problems warranting immediate intervention—by ordering a chest x-ray, blood work and troponin test—met the standard of care for a patient with Plaintiff's symptoms.

With respect to the Plaintiff's allegations of improper discharge from the ED, Dr. Sama opines that Defendants acted in accordance with the standard of care when they discharged Plaintiff, determining she was an appropriate patient for an outpatient cardiac follow-up. Dr. Sama opines that ED physicians are not responsible for coming up with a definitive or final diagnosis in cases such as Plaintiff's, only to rule out acute causes. Dr. Sama opines that Defendants correctly determined that Plaintiff was low risk for MACE by calculating her HEART Score at 3. Dr. Sama further opines that the standard procedure for a patient with a HEART Score of 0-3 is to discharge the patient with return precautions and instructions for an outpatient follow-up. Dr. Sama opines that her discharge was proper, as there was no evidence that Plaintiff had suffered a myocardial infarction at the time of her presentation and because she was at low risk for a major cardiac event in the immediate future.

Moreover, Dr. Sama opines that the written and verbal discharge instructions—which directed the Plaintiff to return if the chest pain worsened and to follow-up with a primary care provider—were in accordance with the standard of care. Dr. Elfatihi's discharge note stated the following: "Please follow-up with your regular doctor. If you are not able to make your appointment, please go to the medicine walk-in clinic in the E building on 1st floor at 8am Monday through Friday. Please return to the emergency room for worsening pain, chest pain, shortness of breath, or other concerning symptoms" (KCH records, at 10). Dr. Sama opines that this conformed with the standard of care.

---

[4] Defendant, Dr. Elfatihi, testified that their differential was: cardiac causes, pulmonary embolism, pneumothorax, pneumonia, acid reflux, or musculoskeletal pain (Exhibit K, at 65).

5

[* 5]

On the issue of proximate causation, Dr. Sama opines that no act or omission by the moving defendants denied the Plaintiff the opportunity to avoid an infarct. Instead, Dr. Sama opines that Plaintiff ignored Defendant's discharge instructions and the injury was caused by her own inaction.

With respect to the motion on behalf of resident Dr. Elfatihi, "[a] resident who assists a doctor during a medical procedure, and who does not exercise any independent medical judgment, cannot be held liable for malpractice so long as the doctor's directions did not so greatly deviate from normal practice that the resident should be held liable for failing to intervene" (*Soto v. Andaz*, 8 AD3d 470, 471 [2d Dept 2004]; *see also Tsocanos v. Zaidman,* 180 AD3d 841, 842 [2d Dept 2020]; *Cynamon v. Mount Sinai Hosp*., 163 AD3d 923 [2d Dept 2018]; *Quille v. New York City Health & Hosp. Corp.,* 152 AD3d 808, 809 [2d Dept 2017]). A defendant resident physician seeking summary judgment must demonstrate that he did not perform "any specific, independent act on [their] part [which] proximately caused the injured plaintiff's injuries" (*Nasima v Dolen*, 149 AD3d 759, 760 [2d Dept 2017]) and that "the diagnosis and treatment plan implemented and continued under the supervision of the attending physicians did not include orders so clearly contraindicated by normal practice that ordinary prudence required inquiry into the correctness of the orders" (*France v Packy*, 121 AD3d 836, 837 [2d Dept 2014], citing *Costello v Kirmani*, 54 AD3d 656 [2d Dept 2008]).

Here, the movants have met their prima facie burden as to Dr. Elfatihi, who was a resident at the time of care at issue. Both the hospital records and Dr. Quinn's testimony show that Dr. Elfatihi did not act independently, and instead, provided care under the attending's supervision, and that they the consulted together throughout the care at issue. Further, based on the expert's submission, Dr. Quinn's directives did not so greatly deviate from normal practice that Dr. Elfatihi should have intervened or questioned those directives.

The movants also meet their prima facie burden as to the attending physician Dr. Quinn, based on the opinions of the expert that she did not depart from the standard of care as an ED attending physician in the evaluation, treatment, and discharge of Plaintiff. The burden therefore shifts to Plaintiff to raise an issue of fact with respect to the standard of care and whether Dr. Quinn deviated from that standard.

6

[* 6]

Notwithstanding, the movants' expert does not establish prima facie entitlement to summary judgment on the issue of proximate causation. The movant's sole causation argument is that the onus was on Plaintiff to follow up with the KCH clinic, primary care physician, or cardiologist for further treatment, and that Plaintiff essentially substituted her judgment for the medical advice and discharge instructions she was given. The Second Department has held that a physician is not liable for malpractice when the patient fails to follow proper discharge or post-care instructions (*see Forrest v. Tierney*, 91 AD3d 707, 709 [2d Dept 2012]). However, Plaintiff disputes that she was told to follow up with a cardiologist, and she testified that she was assured there were no abnormalities with her heart. As there are unresolved issues of fact and credibility in the record, the movants have not established prima facie that Plaintiff's injuries from her subsequent infarction were caused only by non-compliance with post-care instructions and not any alleged malpractice.

In opposition, Plaintiff submits an expert affirmation from a licensed physician [name of expert redacted], certified in internal medicine and cardiovascular disease. The Court was presented with a signed, unredacted copy of the affirmation for *in camera* inspection.

Plaintiff's expert opines that both the ED attending physician Dr. Quinn and resident Dr. Elfatihi both departed from good and accepted medical practice on July 5, 2018. At the time of her presentation to the hospital, the expert opines that Plaintiff had "acute coronary syndrome, characterized by unstable angina" based on her complaints and the results of her EKG.

As the expert states, acute coronary syndrome refers to multiple conditions including unstable angina where "blood flow to the heart is reduced or stopped," damaging the heart muscle. The expert opines that when Plaintiff presented to the ED, the standard of care was first to "determine whether these symptoms are cardiac in nature," then determine whether the angina is stable or unstable. The expert opines that Defendants departed from good and accepted standards by failing to admit her for a cardiac workup to rule out unstable angina, a condition which puts a patient at risk for a heart attack or sudden death. The expert opines that this condition was indicated by her symptoms on July 5 – particularly the fact she reported chest tightness had occurred not only after physical exertion but at rest – and her "borderline" EKG results. Thus, the appropriate standard of

7

[* 7]

care, according to the expert, was admitting her to hospital to see a cardiologist and undergo an echocardiogram, stress test, and angiography.

The expert notes that Plaintiff's blood pressure was elevated at 168/111 when it was taken at triage, but no further vitals or blood pressure were taken when Dr. Elfatihi examined her. Additionally, her EKG was "borderline" and "demonstrated abnormal conduction of electrical signals in the anterior wall." The expert opines that this borderline result and "flattened T-waves in the anterior leads," in conjunction with her complaints of chest pain on exertion and at rest, required her to be admitted for further cardiac workup.

Plaintiff's expert opines that Dr. Quinn did not "properly interpret the EKG and consider its significance." In the expert's opinion, the abnormalities in the EKG, especially considering Plaintiff's symptoms and elevated blood pressure, were all symptoms that "warranted further immediate investigation," and at minimum Dr. Quinn "should have repeated the EKG to evaluate any trends in the T-wave changes." The expert counters the opinion of Dr. Sama that there were no "dynamic changes' observed in the EKG, because there was no repeat EKG for comparison.

The expert also counters Dr. Sama's reliance on Plaintiff's HEART score, which the movants' expert opined placed her at low risk. Plaintiff's expert disagrees with that assessment and states that the HEART Score "is a predictor of the risk of cardiac catastrophe in the 30 days after discharge in a patient with stable angina." Because Plaintiff had unstable angina, in the expert's opinion, this assessment was not applicable to her, and in fact "she was at risk for either sudden death or an acute myocardial infarction every single day after that admission." The expert further opines that although she was appropriately given a troponin test, the normal result of that test did not rule out acute coronary syndrome or her "risk of future cardiac events," because troponin enzymes would only be present if the heart was deprived of oxygen for 20 minutes or more, and her episodes at the time had lasted less than five minutes.

Finally, the expert opines that Plaintiff was not given proper discharge instructions. The expert notes that Plaintiff was visiting the United States from Trinidad and Tobago at the time of the events, and she did not have a primary care doctor in the country. The hospital records indicate that she was told she could follow up

8

with the KCH clinic in 3-14 days. However, the expert notes that on the actual written instructions she was given, annexed to the opposition papers, there was a space for "appointment date/time" which was left blank. The expert opines that this was insufficient within the standard of care to convey follow-up instructions to the Plaintiff. Further, there is nothing in the record aside from Dr. Elfatihi's testimony to support that she was ever told to see a cardiologist. Plaintiff disputed that she was ever referred to a cardiologist and testified that she was assured her EKG was normal and that "everything was okay" with her heart. She testified that she believed based on what she was told at the emergency department that her chest pain episodes, at their current level and frequency, were not serious and were not related to her heart. Based on this, the expert opines that the discharge instructions she was given "were misleading regarding the nature and seriousness of her condition." Therefore, Plaintiff's expert counters the movant's argument that she was given proper discharge instructions and that it was her responsibility to return to the walk-in clinic or another provider.

On Dr. Elfatihi specifically, the expert opines that he departed from the standard of care by not recording more details on her history and subjective complaints, including the location and intensity of the pain. The expert opines that attending physician Dr. Quinn then failed to "address the deficiencies" in Plaintiff's history and examination notes, failed to direct a repeat blood pressure and repeat EKG, and failed to independently examine Plaintiff.

On the issue of proximate causation, Plaintiff's expert opines that the alleged failure to interpret and repeat the EKG, failure to admit her to the hospital for further cardiac workup, and improper discharge instructions were the cause of Plaintiff's subsequent myocardial infarction and stent placement. The expert opines that this avoidable myocardial infarction, diagnosed on July 20, 2018, further "caused significant damage to the heart muscle" and has led to further complications of decreased cardiac strength. The expert opines that if she had been appropriately admitted and diagnosed with unstable angina on July 5, her arteries would have been repaired with less severe damage, and the myocardial infarction and 100% artery occlusion could have been avoided.

9

With respect to Dr. Quinn, Plaintiff raises issues of fact which preclude summary judgment. Plaintiff's expert presents a conflicting opinion from the movants' expert that, as the attending physician and the supervisor of Dr. Elfatihi, Dr. Quinn departed from the standard of care in Plaintiff's treatment in the emergency department on July 5, including by failing to order additional tests and admit her to the hospital for cardiac workup in light of her symptoms and EKG results.

Contrary to the movant's argument in reply, Plaintiff's expert does not solely and improperly base their opinions on the automated EKG report, nor does the expert rely on the opinions of a "Dr. Lapinsky" who confirmed the result in the KCH records. Although Plaintiff's expert references the automated computer analysis and states that Dr. Lapinsky "interpreted the EKG as borderline," the expert also offers their own detailed description of the abnormalities seen on the EKG, i.e., flattened T waves instead of upright T waves which demonstrate "disruption of the electrical signals" in the anterior wall. The expert has established their qualifications as a cardiovascular specialist to interpret the EKG and opine as to the standard of care based on these abnormalities and Plaintiff's other symptoms. This conflict between the parties' experts creates a genuine issue of fact that must be resolved by a jury.

On the issue of proximate causation, as previously discussed, the movants did not establish prima facie that Plaintiff was given post-care instructions that she did not follow. Even if this prima facie burden had been met, Plaintiff raises issues of fact sufficient to defeat a motion for summary judgment. Based on Plaintiff's testimony and the unsigned copy of the discharge instructions, Plaintiff's expert opines that she was not given adequate instructions with her discharge (including a follow-up appointment date) and the nature of her heart condition was not explained to her in accordance with the standard of care. Contrary to the movants' argument in reply, there are issues of fact raised by the parties' testimony and the experts' opinions on the sufficiency of the follow-up or "aftercare instructions" that Plaintiff was given. These circumstances are not identical to cases involving non-compliance with medication, nor the case cited by movants in which there was a signed follow-up directive and no dispute that the patient was given a pneumonia and kidney stone diagnosis and "told to see a

10

recommended pulmonary and critical care specialist . . . in three days" (*Forrest,* at 708). Therefore, summary judgment cannot be granted on this basis as a matter of law.

Additionally, Plaintiff's expert opines that the fact Plaintiff was discharged at all – rather than being admitted for a cardiac workup, definitive diagnosis, and repair to her arteries – was a proximate cause of her ST-elevation myocardial infarction on July 20 and the resulting injuries from that event, e.g., heart muscle damage and decreased cardiac strength. Notwithstanding that the movants did not establish prima facie that any specific claimed injuries were unavoidable with earlier workup and treatment, Plaintiff's expert has raised issues of fact as to proximate causation of those injuries.

Turning to resident Dr. Elfatihi, Plaintiff does not address the issue that he was a resident working under the supervision of the ED physician. His status as a resident is only addressed in one statement from the expert that Dr. Elfatihi was "a third-year resident and therefore had significant emergency room training." In all allegations of his departures from the standard of care, the expert acknowledges that he was "working under the supervision of Dr. Quinn" and that all his notes including the history, examination notes, and discharge orders were co-signed by Dr. Quinn. There is no showing from the parties' submissions that he exercised independent medical judgment, performed independent acts that proximately caused Plaintiff's injuries, or that Dr. Quinn's orders were so outside the norm that ordinary prudence required the resident to question those orders (*see Tsocanos v. Zaidman,* at 842; *Soto v. Andaz,* at 471-472). Accordingly, summary judgment must be granted to Dr. Elfatihi.

Lastly, on the issue of informed consent, the Defendants established prima facie that no care provided at KCH on July 5, 2018, gives rise to this cause of action pursuant to N.Y. Pub. Health Law § 2805-d. During Plaintiff's ED visit, she did not receive any treatment, procedure, or surgery from Defendants, nor did she receive any diagnostic procedure which involved "invasion or disruption of the integrity of the body." Therefore, the informed consent claim is inapplicable to this action. Plaintiff does not oppose the branch of the motion seeking dismissal of the lack of informed consent claim. Summary judgment is therefore granted to Dr.

11

[* 11]

Elfatihi and granted to the extent of dismissing the cause of action for lack of informed consent, only, against Dr. Quinn, and Dr. Quinn's motion for summary judgment is otherwise denied.

It is hereby:

**ORDERED** that the branch of Defendants' motion (Seq. No. 2) seeking an Order, pursuant to CPLR 3212, granting summary judgment to Dr. Quinn and New York City Health & Hospitals Corporation, is **GRANTED TO THE EXTENT** of dismissing the cause of action for lack of informed consent, and the motion is otherwise **DENIED;** and it is further

**ORDERED** that the branch of Defendants' motion seeking an Order, pursuant to CPLR 3212, granting summary judgment to Dr. Elfatihi is **GRANTED.**

The Clerk shall enter judgment in favor of MOHAMED R. ELFATIHI, M.D.

This constitutes the decision and order of this Court.

**ENTER.**

_____

**Hon. Consuelo Mallafre Melendez**

**J.S.C.**

12

[* 12]